FRANKFURT KURNIT KLEIN & SELZ, PC
Maura J. Wogan
Caren E. Lerner
488 Madison Avenue
New York, New York  10022
Phone: (212) 980-0120
Fax:    (212) 593-9175
email: mwogan@fkks.com
        clerner@fkks.com
*Attorneys for Defendant Sycamore Pictures, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

| | | |
|---|---|---|
| SEVEN SEAS PARTNERSHIP LTD., | : | |
| | : | **13 CIV 5054 (DC)** |
| Plaintiff, | : | |
| | : | |
| -against- | : | **DEFENDANT'S ANSWER AND** |
| | : | **COUNTERCLAIM** |
| SYCAMORE PICTURES, LLC, | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------X

The claims asserted by Seven Seas Partnership Ltd. ("SSPL" or "Plaintiff") against

Sycamore Pictures, LLC ("Sycamore" or "Defendant") in this action are completely without

merit and, instead, mere pretext offered up by SSPL in an attempt to justify its wrongful

termination and material breach of the parties' March 7, 2012 Film Financing and Production

Agreement (the "Agreement").  SSPL's claims cannot hide the fact that SSPL has failed to meet

its obligation to fully finance the production of Terrence Malick's *The Voyage of Time* films

("VOT") and has wrongfully terminated the Agreement.

Over thirty-five years ago, Terrence Malick, one of America's most admired filmmakers,

conceived of, and began producing, a documentary he ultimately entitled VOT.  In December of

2010, SSPL, an entity created under the laws of Jersey, entered the scene and offered to finance

the completion of VOT, representing that it "ha[d] the financial ability to perform its funding

obligations as set forth in the Agreement" (Agreement ¶ 13.1 (d)) and agreeing that Mr. Malick would have full control over all creative decisions relating to VOT (Agreement ¶ 2.3) and would be able to work on other film projects as the same time that he was working on VOT (Agreement Schedule 9, ¶ 2(c)).  In return, SSPL would own the copyright in VOT and have the right to distribute VOT throughout the world.

Shortly after the parties signed the Agreement, it became clear that SSPL would not live up to its obligations thereunder:

- In December of 2012, SSPL notified Sycamore that it was immediately suspending, and did suspend, its funding of VOT because of Sycamore's purported failure to use best efforts to produce VOT in accordance with the production schedule, **although Sycamore had met each and every one of the production milestones set forth in the Agreement;** and

- In January of 2013, without any justification, SSPL notified Sycamore that it was in material breach of the Agreement, although it was not, and wrongfully exercised its "termination rights" under the Agreement, including the right to assert ownership and control over the copyright in, and the physical materials comprising, VOT.

SSPL's actions, including SSPL's failure to provide the agreed-upon funding, constitute material breaches of its obligations under the Agreement and have directly damaged Sycamore.

In contrast, Sycamore, from the very first moment that it received funding from SSPL until SSPL wrongfully terminated the Agreement, fully performed its obligations under the Agreement and used the funding supplied by SSPL in connection with the production of VOT. In addition, Sycamore, in good faith, attempted to comply with each and every demand made by

SSPL—even when such demands imposed unreasonable burdens on Sycamore never contemplated by the Agreement:

- Using the SSPL funding and other monies raised earlier from other sources, Mr. Malick and Sycamore created more than 3300 minutes of raw footage, the product of over 15 shoots (175 shooting days) since 2008 conducted around the world, and several hundred pre-vis visual effects shots.

- Mr. Malick and Sycamore edited the VOT footage and other materials and created a "picture assembly," or rough draft of VOT.  Sycamore provided SSPL with detailed evidence of the completion of the picture assembly and offered to make Mr. Malick available to SSPL in London or Texas (where VOT is being produced) to present the picture assembly.

- When SSPL demanded that Sycamore eliminate virtually all licensed footage from VOT, even though the Agreement and the production plan and budget specifically contemplated the use of licensed footage and that Mr. Malick would have complete creative control over VOT, Sycamore attempted to satisfy SSPL's demand and devoted its resources to developing a new creative and production plan, including the use of enhanced visual effects.

At the time it wrongfully terminated the Agreement and at the time it filed its Complaint, SSPL was in possession of all of the VOT footage to date, all of the production reports detailing the VOT shoots to date and all of the accounting records related to the production of VOT. Thus, SSPL knew that it would not be able to substantiate its allegations that Mr. Malick "forgot" to make VOT, or that Sycamore misused funds received from SSPL or that SSPL was justified in cutting off the funding for VOT and terminating the Agreement.

Sycamore believes that SSPL nonetheless concocted the story told in its Complaint and asserted its trumped-up claims as a pretext for the fact that it either ran out of, or never had, the funds necessary to meet its financing obligations under the Agreement, or otherwise decided not to continue funding VOT in breach of its contractual obligations. Even more important to Sycamore and Mr. Malick, SSPL is using its meritless claims to hold hostage VOT—the films Mr. Malick has been working on for most of his professional life.

Given SSPL's material breaches and wrongful termination of the Agreement, equity demands that SSPL either be required to perform fully its obligations under the Agreement, or, in the alternative, to return the copyright in VOT and production materials to Sycamore, so that Mr. Malick can finally finish the epic film that SSPL agreed, but failed, to finance.

Accordingly, Defendant Sycamore, by and through its attorneys, Frankfurt Kurnit Klein & Selz, P.C., for its counterclaim and answer to the Complaint by Plaintiff SSPL, respectfully alleges as follows:

1.      Defendant denies each and every allegation set forth in Paragraph 1 of the Complaint, except admits that Malick described the production of VOT as "one of my greatest dreams, a dream I've been pursuing for my entire career."

2.      Defendant denies each and every allegation set forth in Paragraph 2 of the Complaint.

3.      Defendant denies each and every allegation set forth in Paragraph 3 of the Complaint, except admits and affirmatively alleges that SSPL demanded that Sycamore and Mr. Malick change the creative direction and production plan for VOT; that SSPL demanded that Sycamore eliminate licensed footage from VOT and, instead, incorporate significantly enhanced visual effects; that SSPL's demands necessitated additional funding and an extension of the

delivery deadlines set forth in the Agreement; and that Donald Rosenfeld ("Rosenfeld"), speaking on behalf of SSPL, agreed to the same.

4.      Defendant denies each and every allegation set forth in Paragraph 4 of the Complaint, except refers to the Agreement for the content therein and admits and affirmatively alleges that SSPL requested, and Defendant provided to SSPL, full access to the documentation and information related to the development, production, and/or post-production of VOT.

5.      Defendant denies each and every allegation set forth in Paragraph 5 of the Complaint, except Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations set forth in the second sentence, and, on that basis, denies them.

6.      The first sentence and third sentences of Paragraph 6 of the Complaint makes a statement to which no response is required.  Defendant denies the allegations set forth in the second sentence.

7.      Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 7 of the Complaint and, on that basis, denies them.

8.      Defendant denies each and every allegation set forth in Paragraph 8 of the Complaint, except admits that it is a film production company incorporated under the laws of Texas, with its principal place of business located at 1406 Camp Craft Road, Suite 200, Austin, Texas 78746.

9.      Paragraph 9 of the Complaint makes a statement to which no response is required.

10.     Paragraph 10 of the Complaint makes a statement to which no response is required.

11.     Paragraph 11 of the Complaint makes a statement to which no response is required.

12.     Defendant denies each and every allegation set forth in Paragraph 12 of the Complaint, except admits that VOT, as envisioned by Mr. Malick, "portray[s] the events of our universal cosmic history, as well as the state of the earth now and the prospects for its future"; that Mr. Malick described the production of VOT in a letter sent to SSPL in October 2011 as "one of my greatest dreams, a dream I've been pursuing for my entire career"; and that Mr. Malick stated that VOT has "always been the film I most wanted to make."

13.     Defendant denies the allegations set forth in the first three sentences of Paragraph 13 of the Complaint except refers to the Agreement for the content therein.  Defendant admits the allegations set forth in the fourth sentence in Paragraph 13 of the Complaint, except denies the allegation that "[a]ccording to Malick, the VOT Films' narration would include a ... major female A-list movie star."

14.     Defendant denies each and every allegation set forth in Paragraph 12 of the Complaint, except admits that it engaged Rosenfeld, who received an executive producer credit on Mr. Malick's 2011 film *The Tree of Life*, to serve as one of the producers on VOT, and that Rosenfeld introduced Sycamore to SPPL and Roald and worked to secure SPPL's funding of VOT.

15.     Defendant denies the allegations set forth in Paragraph 15 of the Complaint except refers to the Letter Agreement for the content therein.

16.     Admitted.

17.     Defendant denies each and every allegation set forth in Paragraph 17 of the Complaint, except admits that by March 2012, Defendant had obtained $2,437,500 from a private foundation grant and $2,493,966 from SSPL to produce VOT.

6

18.     Defendant denies each and every allegation set forth in Paragraph 18 of the Complaint, except admits that throughout 2011 and early 2012, Sycamore and Mr. Malick represented to SSPL that footage for VOT was being shot and produced on schedule.

19.     Defendant admits the allegation set forth in first two sentences of Paragraph 19 of the Complaint, and denies each and every allegation set forth in the last sentence of Paragraph 19.

20.     Defendant denies each and every allegation set forth in Paragraph 20 of the Complaint, except admits that the parties executed the Agreement on March 7, 2012, which replaced the previous Letter Agreement and refers to the Letter Agreement for the content therein.

21.     Defendant denies each and every allegation set forth in Paragraph 21 of the Complaint, except admits that the "Early Man Shoot" was not completed at the time the parties entered the Agreement, and that Mr. Malick stated that Sycamore was "looking for people in Papua New Guinea that embody the ferocity of our distant ancestors."

22.     Admitted.

23.     Defendant denies each and every allegation set forth in Paragraph 23 of the Complaint except refers to the Agreement for the content therein.

24.     Defendant denies each and every allegation set forth in Paragraph 24 of the Complain, except refers to the Agreement for the content therein, except lacks sufficient knowledge or information to form a belief as to the truth of the allegation that funding from other sources for VOT "was an important consideration for SSPL in its decision to invest in the Pictures", and, on that basis, denies it.

7

25.     Defendant denies each and every allegation set forth in Paragraph 25 of the Complaint except refers to the Agreement for the content therein.

26.     Defendant denies each and every allegation set forth in Paragraph 26 of the Complaint except refers to the Agreement for the content therein.

27.     Defendant denies each and every allegation set forth in Paragraph 27 of the Complaint except refers to the Agreement for the content therein. Defendant further admits and affirmatively alleges that Mr. Malick represented, "[f]rom the date of the Agreement I agree to work, as far as reasonable on a non-exclusive basis on the production and post-production of the Picture until such time as all my obligations regarding the production and post-production of the Picture have been fulfilled in accordance with my Director's Rider" and that Mr. Malick represented, "[t]he Financier has acknowledged and I agree that I shall be able to work on other projects during the term of the Agreement provided that such projects do not materially interfere with my provision of services to the Company in relation to the Picture[.]"

28.     Defendant denies each and every allegation set forth in Paragraph 28 of the Complaint except refers to the Agreement for the content therein.

29.     Defendant denies each and every allegation set forth in Paragraph 29 of the Complaint, and affirmatively alleges that Sycamore and Mr. Malick met all of their obligations under the Agreement.

30.     Defendant denies the allegations set forth in Paragraph 30 of the Complaint except to the Agreement for the content therein.

31.     Defendant denies the allegations set forth in Paragraph 31 of the Complaint except refers to the Agreement for the content therein.

32.     Defendant denies the allegations set forth in Paragraph 32 of the Complaint except refers to the Agreement for the content therein.

33.     Defendant denies the allegations set forth in Paragraph 33 of the Complaint except refers to the Agreement for the content therein.

34.     Defendant denies the allegations set forth in Paragraph 34 of the Complaint except refers to the Agreement for the content therein.

35.     Defendant denies the allegations set forth in Paragraph 35 of the Complaint, except refers to the Agreement for the content therein.

36.     Defendant denies the allegations set forth in Paragraph 36 of the Complaint except refers to the Agreement for the content therein.

37.     Defendant denies the allegations set forth in Paragraph 37 of the Complaint except refers to the Agreement for the content therein.

38.     Defendant denies the allegations set forth in Paragraph 38 of the Complaint.

39.     Defendant denies the allegations set forth in Paragraph 39 of the Complaint, except admits and affirmatively alleges that since 2011, four feature films written and directed by Mr. Malick, all of which SSPL had full knowledge of, have been released, or will be released in the future.

40.     Defendant denies the allegations that *Knight of Cups* and *Untitled* are set for release in 2013, and admits the remaining allegations set forth in Paragraph 40 of the Complaint.

41.     Defendant denies the allegations set forth in Paragraph 41 of the Complaint.

42.     Defendant denies the allegations set forth in Paragraph 42 of the Complaint.

43.     Defendant denies the allegations set forth in Paragraph 43 of the Complaint, except lacks sufficient knowledge or information to form a belief as to the truth of the allegation

that "SSPL never agreed to any payment or financing structure to fund any other projects or films except *Voyage of Time*."

44.     Defendant admits the allegations set forth in the first sentence of Paragraph 44 of the Complaint, except affirmatively alleges that SSPL refused to fulfill its funding obligations under the Letter Agreement.  Defendant denies each and every allegation set forth in the second sentence of Paragraph 44 of the Complaint.

45.     Defendant denies the allegations set forth in Paragraph 45 of the Complaint that "Malick misled [Trumbull]" and that "since Malick had accomplished very little progress on the VOT Film, suddenly Sycamore was attempting to rely on Trumbull for more and more visual effects work to compensate for the gap," and affirmatively alleges that at the request of SSPL, Sycamore explored the use of additional visual effects work to meet SSPL's demand that Sycamore change its creative direction and be more "unique"; and that Trumbull proposed that the scope of his visual effects work for VOT be expanded.  Defendant lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations set forth in Paragraph 45 of the Complaint and, on that basis, denies them.

46.     Defendant denies the allegations set forth in Paragraph 46 of the Complaint, except admits and affirmatively alleges that Rosenfeld approved the messaging that Sycamore disclosed at a film festival in Venice.

47.     Admitted, except Defendant denies the allegation set forth in Paragraph 47 that Sarah Green and Nicholas Gonda are Mr. Malick's "assistants."

48.     Defendant denies the allegations set forth in Paragraph 48 of the Complaint, except admits that Mr. Malick agreed to provide, and did provide, a dynamic description of the story in VOT.  Defendant further affirmatively alleges that the agenda for this meeting was pre-

10

approved by Rosenfeld and adhered to by Mr. Malick and Sycamore, and that Mr. Malick spent well over two hours speaking with the potential corporate sponsor about VOT.

49.     Defendant denies the allegations set forth in Paragraph 49 of the Complaint, except admits that the footage presented from the "Early Man" shoot did not contain material from the Solomon Islands, as safety, creative and immigration issues prevented Mr. Malick from shooting in the Solomon Islands.

50.     Defendant denies the allegations set forth in Paragraph 50 of the Complaint, and affirmatively alleges that, in response to Sycamore's offer to proceed with the current Production Schedule or, instead, to move forward with the new creative direction proposed by SSPL and to delay the schedule, Rosenfeld stated that the "agreed [delivery] schedule [for VOT] was Not a valid choice" and that "the new Schedule is the only choice to actually Achieve this long gestating Masterpiece." (Rosenfeld/Green Email, Oct. 19, 2012.)

51.     Defendant denies the allegations set forth in Paragraph 51 of the Complaint, except admits that, at the request of Rosenfeld, Mr. Malick signed a letter to Roald on October 22, 2012, which was requested and drafted by Rosenfeld and speaks for itself.

52.     Defendant denies the allegations set forth in Paragraph 52 of the Complaint, except admits that Roald sent a letter to Mr. Malick, which speaks for itself.

53.     Defendant denies that there were any significant setbacks to the VOT production. Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 53 of the Complaint and, on that basis, denies them, except admits that Trumbull sent a letter to Mr. Malick, which speaks for itself.

54.     Defendant denies the allegation set forth in the first and second sentences of Paragraph 54 of the Complaint.  Defendant lacks sufficient knowledge or information to form a

11

belief as to the truth of the allegations set forth in last sentence of Paragraph 54 of the Complaint and on that basis denies them.

55.    Defendant denies the allegation set forth in Paragraph 55 of the Complaint, except admits that SSPL demanded to inspect, and Defendant provided to SSPL, the original copies of Sycamore's financial records, including every receipt ever incurred by the production.

56.    Defendant denies the allegation "[d]espite these events" set forth in the first sentence of Paragraph 56 of the Complaint and admits the remaining allegations set for in Paragraph 56 of the Complaint.

57.    Defendant admits the allegations set forth in Paragraph 57 of the Complaint and affirmatively alleges that, Defendant provided the requested accounting documents to SSPL.

58.    Defendant denies the allegations set forth in Paragraph 58 of the Complaint, except admits that, while an accountant for Sycamore claimed "[a]s this is a documentary I do not believe there are Production Reports for most of the shoots", Sycamore subsequently sent SSPL reports from each shoot.

59.    Defendant denies the allegations set forth in Paragraph 59 of the Complaint, except admits that Mr. Malick and Sycamore had shot footage at various spots all over the world without opening bank accounts at certain of those locations and that Sycamore's accountant explained to Rosenfeld via email on November 8, 2012 that Sycamore had opened an account with Arvest Bank in a town in Oklahoma where Mr. Malick was shooting *To the Wonder* because Arvest Bank provided a "cheap way to send wires to [Sycamore's] payroll company," which was the primary method for disbursing funds for VOT, and that this account was subsequently closed per SSPL's request.

12

60.     Defendant admits that, on November 20, 2012, it informed SSPL that the "bank balance" for VOT's production account would be "down to approximately [$13,000]" and affirmatively alleges that Defendant provided SSPL with the requested backup and accounting documents reflecting how the money was spent, except lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations set forth in Paragraph 60 of the Complaint and, on that basis, denies them.

61.     Defendant denies the allegations set forth in Paragraph 61 of the Complaint, except admits that SSPL requested a "full unit crew list" and that, because there were numerous separate shoots over several years, there were separate crew lists, but that Sycamore's accountant assured Rosenfeld, "I am sure we can create one [full unit crew list] for you if one does not exist."

62.     Defendant denies the allegations set forth in Paragraph 62 of the Complaint, except admits that some crew members who worked on VOT also worked on other Malick films, as is not uncommon in the industry.

63.     Defendant denies the allegations set forth in Paragraph 63 of the Complaint, except refers to the emails referenced therein.

64.     Defendant denies the allegations set forth in Paragraph 64 of the Complaint, except refers to the emails referenced therein.

65.     Defendant denies the allegations set forth in Paragraph 65 of the Complaint, except refers to the emails referenced therein.

66.     Defendant denies the allegations set forth in Paragraph 66 of the Complaint, except admits and affirmatively alleges that SSPL has received a complete set of Sycamore's records related to the expenditure of SSPL's funding for VOT; that BTL Production Services, a

production service company, sent an invoice for cast and crew payroll charges to Sycamore

Pictures on April 4, 2011 all related to VOT and that a cover page for a payroll wire transfer was

placed over the invoice and addressed to Arvest Bank, which contains the misworded letterhead:

"Sycamore Pictures, LLC:  Untitled TM Project."

  67.  Defendant denies the allegations set forth in Paragraph 67 of the Complaint,

except admits that on July 15, 2012, a check was written to "City of Austin – Parks and

Recreation" for a VOT location fee and was debited from Sycamore's account.  Defendant

further admits that the internal Sycamore "check request" document that accompanies the check

receipt mistakenly contains the letterhead "Untitled TM Project: Redbud Pictures, LLC," which

is a Malick-owned entity responsible for producing *To the Wonder*.

  68.  Defendant denies the allegations set forth in Paragraph 68, except refers to the

invoice referenced therein.

  69.  Defendant admits the allegations set forth in Paragraph 69 of the Complaint, and

states that, as was reported and explained to SSPL, because filming for VOT's Early Man

sequence was taking place in remote locations in New Mexico and Colorado, prepayments were

made on the VOT credit card so as not to cause delay on the VOT set.

  70.  Defendant denies the allegations set forth in Paragraph 70 of the Complaint,

except admits that, on October 10, 2012, a check was written to American Express from

Sycamore's account in an amount over $5000 to pay for VOT expenses, and that an incorrect

"check request" form on "Knight of Cups:  Dogwood Pictures, LLC" letterhead was originally

used, but was corrected internally.  Defendant further admits that its accountant disclosed to

SSPL that, during a period of heavy shooting for VOT's Early Man sequence, American Express

cards were issued to coordinator Kate Poss, who was handling travel and hotel for VOT, and

Jennifer Hawbaker, who was handling in the moment costume purchases for VOT, allowing for expenses to be paid and tracked in a timely fashion.

71.     Defendant denies the allegations set forth in Paragraph 71 of the Complaint, except admits that a June 16, 2012 cost report lists $128,941 spent by Sycamore on makeup and hair for the "Early Man" shoot.  SSPL was aware at the time that the savings from not shooting in the Solomon Islands was being used to cover this cost for special effects makeup and hair.

72.     Defendant denies the allegations set forth in Paragraph 72 of the Complaint.

73.     Defendant denies the allegations set forth in Paragraph 73 of the Complaint, except admits that SSPL sent a letter to Sycamore dated January 11, 2013, which speaks for itself, and lacks sufficient knowledge or information to form a belief as to the truth of the allegations set forth in the last sentence of Paragraph 73 and, on that basis, denies them.

74.     Defendant denies the allegations set forth in Paragraph 74 of the Complaint, except admits that SSPL sent a letter to Sycamore dated January 11, 2013, which speaks for itself.

75.     Defendant denies the allegations contained in Paragraph 75 of the Complaint, except admits that counsel for Sycamore sent a letter to counsel for SSPL, dated January 17, 2013, which speaks for itself.

76.     Defendant denies the allegations set forth in Paragraph 76 of the Complaint, except admits that SSPL sent a letter to Sycamore dated February 15, 2013, which speaks for itself.

77.     Defendant denies the allegations set forth in Paragraph 77 of the Complaint.

78.     Defendant denies the allegations set forth in Paragraph 78 of the Complaint.

## FIRST CAUSE OF ACTION
### Specific Performance

79.     Defendant repeats and re-alleges its responses to the allegations set forth in Paragraphs 1 through 78 of the Complaint as if they are fully set forth herein.

80.     Admitted.

81.     Defendant denies the allegations set forth in Paragraph 81 of the Complaint.

82.     Defendant denies the allegations set forth in Paragraph 82 of the Complaint.

83.     Defendant denies the allegations set forth in Paragraph 83 of the Complaint.

84.     Defendant denies the allegations set forth in Paragraph 84.

85.     Defendant denies the allegations set forth in Paragraph 85 of the Complaint and affirmatively alleges that SSPL is in possession of the complete books and records of Sycamore related to the development, production and post-production of VOT through December 13, 2012.

86.     Defendant denies the allegations set forth in Paragraph 86 of the Complaint.

87.     Defendant denies the allegations set forth in Paragraph 87 of the Complaint.

88.     Defendant denies the allegations set forth in Paragraph 88 of the Complaint.

89.     Defendant denies the allegations set forth in Paragraph 89 of the Complaint.

## SECOND CAUSE OF ACTION
### Breach of Contract

90.     Defendant repeats and re-alleges its responses to the allegations set forth in Paragraphs 1 through 89 of the Complaint as if they are fully set forth herein.

91.     Admitted.

92.     Defendant denies the allegations set forth in Paragraph 92 of the Complaint.

93.     Defendant denies the allegations set forth in Paragraph 93 of the Complaint.

94.     Defendant denies the allegations set forth in Paragraph 94 of the Complaint.

95.     Defendant denies the allegations set forth in Paragraph 95 of the Complaint.

16

96.     Defendant denies the allegations set forth in Paragraph 96 of the Complaint.

97.     Defendant denies the allegations set forth in Paragraph 97 of the Complaint.

98.     Defendant denies the allegations set forth in Paragraph 98 of the Complaint.

99.     Defendant denies the allegations set forth in Paragraph 99 of the Complaint.

100.    Defendant denies the allegations set forth in Paragraph 100 of the Complaint.

101.    Defendant denies the allegations set forth in Paragraph 101 of the Complaint.

102.    Defendant denies the allegations set forth in Paragraph 102 of the Complaint.

103.    Defendant denies the allegations set forth in Paragraph 103 of the Complaint.

104.    Defendant denies the allegations set forth in Paragraph 104 of the Complaint, and refers to the Agreement for the content therein.

105.    Defendant denies the allegations set forth in Paragraph 105 of the Complaint except refers to the Agreement for the content therein.

106.    Defendant denies the allegations set forth in Paragraph 106 of the Complaint.

107.    Defendant denies the allegations set forth in Paragraph 107 of the Complaint.

108.    Defendant denies the allegations set forth in Paragraph 108 of the Complaint.

109.    Defendant denies the allegations set forth in Paragraph 109 of the Complaint.

## THIRD CAUSE OF ACTION
### Declaratory Judgment

110.    Defendant repeats and re-alleges its responses to the allegations set forth in Paragraphs 1 through 109 of the Complaint as if they are fully set forth herein.

111.    Paragraph 111 of the Complaint makes a statement to which no response is required.  To the extent a response is required, Defendant denies the allegations set forth in Paragraph 111.

112.    Admitted.

17

113.    Defendant denies the allegations set forth in Paragraph 114 of the Complaint, except refers to the Agreement for the content therein.

114.    Defendant denies the allegations set forth in Paragraph 114 of the Complaint, except to the Agreement for the content therein.

115.    Defendant admits the allegations set forth in Paragraph 115 of the Complaint, except denies that it has breached the Agreement.

116.    Paragraph 116 of the Complaint makes a statement to which no response is required.  To the extent a response is required, Defendant denies the allegations set forth in Paragraph 116.

117.    Defendant denies the allegations set forth in Paragraph 117 of the Complaint.

## AFFIRMATIVE DEFENSES

Defendant states that it will rely upon the following defenses if applicable and if supported by facts.  Defendant does not admit that it bears the burden of proof for any of these defenses.

1.    The Complaint, and each and every purported claim for relief therein, fails to state a claim upon which relief can be granted.

2.    Plaintiff's claims are barred in whole or in part by Plaintiff's material breaches of its obligations under the Agreement.

3.    Plaintiff's material breaches of the Agreement relieved Defendant of its obligation to continue to perform under the Agreement.

4.    Plaintiff has not sustained any injury or damage as a result of any act or conduct of Defendant.

5.      Plaintiff's claims are barred in whole or in part by the doctrines of waiver, laches, estoppel and/or unclean hands.

6.      Plaintiff has failed to mitigate its damages, if such damages exist.

7.      Plaintiff is not entitled to specific performance because it cannot show that it lacks an adequate remedy at law.

8.      Plaintiff is not entitled to a declaratory judgment because Plaintiff's claim is fully subsumed in its breach of contract cause of action.

9.      The contract damages sought by Plaintiff constitute an unenforceable penalty and/or are otherwise unenforceable at law or equity.

10.     Defendant reserves the right to allege additional affirmative defenses as they may become known, or as they evolve during the litigation, and to amend this Answer accordingly.

## COUNTERCLAIM

It is SSPL, not Sycamore, who materially breached the Agreement by suspending financing for VOT and terminating the Agreement without justification.  Thus, Sycamore, by and through its undersigned counsel, brings this counterclaim for breach of contract against SSPL.

In support thereof, Sycamore states:

1.      Terrence Malick is an acclaimed American film director, screenwriter and producer.  In a career spanning over four decades, Mr. Malick has released only five feature films and, yet, he has received consistent praise for his work and many people, including respected film critic Roger Ebert, have referred to Mr. Malick as one of the greatest living filmmakers.  Mr. Malick's biography found on the *New York Times* website states:

> A visual stylist beyond compare, Malick emerged during the golden era of 1970s American movie-making, bringing to the screen a dreamlike, ethereal beauty countered by elliptical, ironic storytelling; resonant and mythic, his films

illuminated themes of love and death with rare mastery, their indelible images distinguished by economy and precision.

Mr. Malick was nominated for the Academy Award for Best Director for *The Thin Red Line* and *The Tree of Life*, and the Academy Award for Best Adapted Screenplay for *The Thin Red Line*, as well as winning the Golden Bear at the 49th Berlin International Film Festival for *The Thin Red Line*, the Palme d'Or at the 64th Cannes Film Festival for *The Tree of Life*, and the SIGNIS Award at the 69th Venice International Film Festival for *To the Wonder*.

## Background of VOT

2. Several decades ago, Mr. Malick had a vision to create what would become VOT: a cosmic epic examining the history of time from the very birth of universe to the final collapse back to the universe's original state. He originally envisioned this to be an experiential film, with little or no narration, that would be an awe-inspiring encounter with nature's past and future.

3. In 1978, Mr. Malick began working on what would become VOT. He conducted extensive research and tests, and went on scouting expeditions in Nepal, India and North Africa. He also met with researchers who could provide support and/or existing footage for VOT.

4. From approximately 1982 through 2000, Mr. Malick continued shooting tests and astronomical events as they presented themselves, ultimately to be incorporated into VOT. Mr. Malick also scouted potential shooting locations, including Australia, Hawaii, Iceland, Costa Rica, Yellowstone and Morocco. Mr. Malick further developed contacts and relationships with IMAX, National Geographic, BBC and others in connection with his efforts to develop VOT.

5. During this time, Mr. Malick also attended major wildlife filmmaker conferences in Jackson Hole, Wyoming and Bristol, England, where he met the cameramen who eventually

shot portions of VOT.  Mr. Malick also made contacts in the academic community, including Andrew Knoll, who became one of the principal consultants on VOT.

6.      In July 2007, Sarah Green ("Green") and Nicolas Gonda ("Gonda), producers on VOT, began seeking funding for VOT.  They engaged Donald Rosenfeld ("Rosenfeld") to serve as a producer on VOT and assist them with raising funds for VOT.

7.      On March 27, 2008, Rosenfeld confirmed that a $2.5 million grant had been made from one foundation to another, for use in VOT.  Sycamore negotiated the grant from the second foundation, resulting in a grant to Sycamore for VOT in the amount of $2,437,500 million. Pursuant to this grant, Sycamore received the following funding for VOT:  (1) $1,009,625 on May 14, 2008, and (2) $1,427,875 on August 12, 2008.

**Prior to SSPL's Involvement in VOT, Mr. Malick**
**Completes 131 Days of Shooting Original Footage for VOT**

8.      As of September 9, 2008, all of the cash committed as of that date for VOT had been provided, and sixty-three days of shooting in the Southwestern U.S., Hawaii and Iceland had been completed.

9.      Because VOT was in a very active state of production, Green informed Rosenfeld that Sycamore needed another $500,000 per month from October 2008 through January 2009 to continue at this rate.  Rosenfeld, however, was not able to secure this additional funding.

10.     On behalf of Sycamore, Green ultimately was able to secure a $250,000 loan to keep VOT afloat during this period.  Rosenfeld also personally loaned approximately $165,000 to Sycamore for VOT.

11.     By December 2009, Sycamore was able to complete an additional sixty-eight days of shooting original footage for VOT in Kenya, California, Chile and Palau.

**In December 2010, SSPL Agrees to Finance the Completion of VOT**

12.     In November 2010, Green informed Rosenfeld that a grant, which she and Gonda had been negotiating for nearly 1.5 years, fell through.  Although Rosenfeld had not brought any investor to Sycamore since the private foundation grant in early 2008, Rosenfeld, on this same call with Green, surprisingly stated that he had found a wealthy individual interested in investing $7,500,000 in VOT.  Rosenfeld described this potential equity investor as "nice and genuine – hates Hollywood trickery."  Rosenfeld further stated in an email to Green, "I do not think this will go away if we are clear, straightforward, always fair and open….[O]ur attorneys have let us down on more than one occasion[.]…This is probably a do or die – and, I would like Nothing More than to see Terry make this Amazing film, realizing VOYAGE OF TIME ("THE CREATION"), in all its Glory!" (capitalization his own in this and subsequent emails).

13.     Rosenfeld consistently portrayed this investor as a wealthy individual who had the ability to personally fund this $7,500,000 investment in VOT.  Rosenfeld, however, refused to disclose his identity until less than two weeks before the financing deal closed.  Sycamore never negotiated directly with the investor and was never even supplied with his contact information. Instead, Rosenfeld assumed the role of negotiating with this unidentified individual on Sycamore's behalf, and insisted that all communications with the investor go through him.

14.     On November 22, 2010, Green detailed the various deal points for the potential financing arrangement with Rosenfeld's unidentified investor, including:  $1,000,000 cash flowed and an additional $1,000,000 escrowed at signing, and the balance of the proposed $7,500,000 investment escrowed by April 15, 2011, to be released per an agreed-upon cash flow schedule.  Rosenfeld, in an attempt to dissuade Sycamore from insisting on the escrow requirement for the final $5,000,000, responded "we don't need investor to escrow the rest" after the first $2,500,000.

15.    That same day, Green again asked Rosenfeld for the identity of the equity investor, explaining that Sycamore needed to know the name of the investor if it was going to consider foregoing the escrow requirement.  Rosenfeld again refused to provide the investor's name, and stated to Green, "contrary to my discussion with you yesterday, Our Attorney, is requiring on April 15, 2011, an unnecessary additional Escrowing of $5 Million."

16.    Rosenfeld, in a further attempt to dissuade Sycamore from negotiating aggressively with the investor and insisting on the $5 million escrow provision, sent another email to Green that stated:

> [The escrow provision] will not communicate a spirit of Partnership and Joint Venture – but, instead an Overreaching Hollywood style dealmaking, which will completely Turn Off our Investor....I have an investor ready to close – we should not Alienate him....He is honest, low profile and decent. I think I need to be on every call with our Lawyers and the Investor....The current Deal Shall close December 10, 2010 – but we must be sensible and non-confrontational. This investor will Flee, if there is the slightest bit of high-handed posturing from our side. Let's get this Accomplished.

17.    On November 23, 2010, Rosenfeld sent yet another email to Green that stated, "DEFINITELY lose Escrow of final $5 million[.]"

18.    That same day, in reliance on Rosenfeld's representations concerning the investor's financial security and ability to individually commit $7,500,000 to VOT, and in reliance on Rosenfeld's representations that he was acting in and negotiating with the investor on behalf of Sycamore's best interests, Sycamore informed Rosenfeld that it had agreed to accept Rosenfeld's recommendation and forego the escrow requirement for the final $5 million.

19.    On December 1, 2010, Rosenfeld finally disclosed the name of the equity investor:  Andreas Roald ("Roald").  Rosenfeld stated to Sycamore, "His Investment on my EFFIE film took 4 Months of detailed discussion.  I would say this Bird in Hand will save VOYAGE."

23

20.     Rosenfeld continued to bolster the financial security of Roald, stating, "Investor has initial $1 Million ready to send upon Memo Signing, already segregated from his other Investments." Rosenfeld further emphasized that the investment was from an individual, when he forwarded a communication from Roald (without Roald's contact information attached) that stated, "I am investing in [Rosenfeld] and Mr. Malick.  Consequently, I will be signing this deal personally, I would like Mr. Malick to sign on behalf of Sycamore."

21.     However, on December 11, 2010, Rosenfeld presented a corporate entity that Roald would be using to fund VOT:  SSPL.

22.     The following day, Rosenfeld again reminded Green to "instruct the Lawyers to draft with generosity of spirit" and not negotiate aggressively with Roald.

23.     On December 16, 2010, Rosenfeld told Green that Roald had agreed to invest an additional $1,000,000 in VOT to create or license additional footage for use in VOT.

24.     SSPL and Sycamore subsequently entered into a formal letter agreement (the "Letter Agreement"), dated as of December 10, 2010, which set forth the material terms of SSPL's financing of VOT.

25.     Sycamore's agreement to enter into the Letter Agreement with SSPL and forego the $5 million escrow requirement was in reliance upon the Rosenfeld's representations that SSPL was funded solely by Roald—an "honest" and "decent" wealthy individual who had the financial means to fund SSPL's $8,500,000 investment in VOT.

**The Letter Agreement**

26.     Pursuant to Section 3 of the Letter Agreement, SSPL agreed to finance VOT, "a motion picture documentary," pursuant to the following cash flow schedule:  (1) $1,000,000 upon execution of the Letter Agreement; (2) $1,500,000 escrowed by June 1, 2011 to be released

in accordance with the Cash Flow Schedule; (3) $1,500,000 escrowed by September 1, 2011 to be released in accordance with the Cash Flow Schedule; (4) $2,000,000 escrowed within 30 business days of the Financier's receipt of a notice indicating that the photography for the Picture has been completed, to be released in accordance with the Cash Flow Schedule; and (5) $1,000,000 escrowed within 30 business days of the Financier's receipt of a notice indicating that the picture lock has been completed, to be released in accordance with the Cash Flow Schedule.

     27.     Pursuant to Section 5(e) of the Letter Agreement, SSPL acknowledged that Sycamore might license footage from third parties for VOT.

     28.     Pursuant to Section 11 of the Letter Agreement, SSPL and Sycamore agreed to negotiate in good faith a long form agreement incorporating the terms set forth in the Letter Agreement.

**SSPL Begins Funding VOT and Sycamore**
**Provides SSPL With Monthly Cash Flow Reports**

     29.     On December 17, 2010, SSPL funded $1,000,000 to VOT via a wire transfer from Rosenfeld's company High Line Pictures.  Rosenfeld never provided Sycamore with an explanation for why this wire, and all of SSPL's subsequent funding, was issued from Rosenfeld's company.  From these funds, Rosenfeld was reimbursed for his $165,000 loan to VOT, which he made in 2008.

     30.     David Melito, Sycamore's accountant, sent monthly cash flow reports to SSPL through Rosenfeld in accordance with the Letter Agreement.  When Melito told Rosenfeld that he could not send them directly to SSPL because he did not have Roald or SSPL's contact information, Rosenfeld responded, "Andreas has asked that all emails/documents go via me to him."

31.    In July 2011, Sycamore completed 13 days of shooting in Texas and Louisiana. In advance of this, Sycamore requested and SSPL funded an additional $878,404 to VOT.

32.    Thus, as of July 1, 2011, SSPL funded $1,878,404 toward VOT.  However, pursuant to the cash flow schedule set forth in the Letter Agreement, SSPL had committed to funding $2,500,000 by this date.

## SSPL and Sycamore Negotiate the Agreement While VOT Shooting Continues

33.    On or around August 2011, Sycamore and SSPL began to negotiate the Agreement, which would replace the Letter Agreement.

34.    Once again, Rosenfeld purported to negotiate with Roald on behalf of Sycamore, and to act, as a VOT producer, in Sycamore's best interests.

35.    On August 23, 2011, Rosenfeld phoned Green and insisted that Sycamore drop the requirement that SSPL escrow the outstanding balance that SSPL had agreed to fund. Rosenfeld emphasized to Green that Roald is "recession proof" and is not escrowing funds for *Effie*. Because Sycamore relied on Rosenfeld's representations that he was negotiating with Roald on Sycamore's behalf and acting in Sycamore's best interests, Sycamore agreed to forego the escrow requirement.

36.    While the Agreement was being negotiated, shooting continued on VOT.  In September 2011, shooting began in Yellowstone National Park.

37.    On November 5, 2011, Green emailed Rosenfeld concerning a number of points in SSPL's draft long form agreement that "deviate[d] quite a bit from the original understanding" and suggested that she, Gonda and Rosenfeld "huddle as a team and decide how best to address them" before instructing SSPL and Sycamore's counsel to interact.  For example, Green noted

that SSPL's draft agreement provided that SSPL would own the copyright in VOT, which was contrary to the Letter Agreement.

38.     Sycamore ultimately agreed to Roald's unusual proposed deal structure in reliance on Rosenfeld's representations that Roald is a "straight up guy" who had the financial ability to fund personally SSPL's investment in VOT.

**The Agreement**

39.     On March 7, 2012, the parties entered into the Agreement.  The Agreement provides that SSPL "shall pay to Sycamore the Financier Contribution" (Agreement ¶ 3.1), which included an "Initial Financier Contribution" paid by SSPL prior to the execution of the Agreement and the "Supplemental Financier Contribution," which consisted of Monthly Installments payable pursuant to Schedules 2 and 8 of the Agreement.   The Agreement provided that SSPL would pay to Sycamore a total of $9,300,000 to be used in connection with the production of the Films.  Agreement, Schedule 8.

40.     In the Agreement, SSPL warranted and represented that it "has the financial ability to fully perform its funding obligation under this Agreement."  Agreement, ¶13.1 (d).

41.     The Agreement provides that Sycamore "shall use its best efforts to complete the [Films] in accordance with (a) the Production and Post Production Schedule and (b) the Picture Budget."  Agreement, ¶ 2.1.  The Production and Post Production Schedule is a timetable set forth in Schedule 6 of the Agreement and includes dates by which Sycamore agreed to achieve four key Production Milestones: "Completion of Early Man Sequence," "Picture Assembly," "Picture Lock" and "Final Mix."  The Agreement further provides that Sycamore "shall provide [SSPL] with written confirmation (and any documentary evidence reasonably requested by

[SSPL] to validate such confirmation) within seven (7) business days of achieving [each Production Milestone." Agreement, ¶ 4.2.

42.     In the Agreement, Sycamore warrants that the Films will be directed by Mr. Malick and that it will obtain an "inducement letter" from Mr. Malick in the form set out in Schedule 9 of the Agreement. In the inducement letter, Mr. Malick agrees that, from the date of the Agreement, he will work "as far as is reasonable on a *non-exclusive* basis" on the production and post production of the Films. Agreement, Schedule 9, ¶ 2(c). The Agreement and the inducement letter further provide that "SSPL has acknowledged and [Mr. Malick agrees] that [he] shall be able to work on other projects during the term of the Agreement provided that such other projects do not materially interfere with [his] provision of services [under the Agreement]." *Id.*

43.     The Agreement provides that Sycamore "shall have full control over all creative decisions relating to the [Films] provided that the [Films] shall be directed by Terrence Malick." Agreement, ¶ 2.2.

44.     Pursuant to the terms of the Agreement and only in consideration for SSPL's agreement to pay the Financier Contribution to Sycamore to complete the Films and in reliance of SSPL representation and warrant under the Agreement that it "has the financial ability to fully perform its funding obligation under th[e] Agreement," Sycamore assigned to SSPL "all right, title and interest" in the intellectual property rights, including the copyright, in the Films and all the materials created in the course of producing the Films. Agreement, ¶¶ 9.1, 13.1(d). Sycamore did, however, reserve certain novelization and literary publication rights in connection with the screenplay for the Films. *Id.*

28

**In April 2012, The Parties Agree to Extend VOT's Delivery Schedule to
Accommodate SSPL's Request that Mr. Malick Devise a New Creative Approach to VOT**

45.     On April 19, 2012, Roald and Rosenfeld traveled to Sycamore's editorial offices

in Austin, Texas for two days of meetings to discuss VOT.  This was the first time that Gonda,

Green and Mr. Malick met Roald.  Sycamore conducted a screening of VOT footage to date for

Roald and Rosenfeld.  In response, Roald expressed his desire that VOT be "more unique" and

requested that VOT add enhanced visual effects ("VFX") in both its 35mm and IMAX forms.

46.     Despite Mr. Malick's contractual right to creative control over VOT, and without

limitation to the same, Mr. Malick agreed to devise a new creative approach to the film that

would use more original footage and more sophisticated visual effects.  SSPL agreed that the

delivery schedule for VOT would be extended to accommodate SSPL's request, as Sycamore

needed time to create and present a revised VFX proposal and creative vision.

47.     Based on the April meetings and in reliance on the agreement of the parties to

pursue a new creative approach and extend the delivery schedule for VOT, Sycamore and Mr.

Malick spent the next several months (a) reconceiving the creative vision for VOT; (b)

developing an entirely new VFX production plan for VOT; (c) conducting approximately thirty

(35) visual effect reviews with a visual effects supervisor  and (d) extensively editing existing

footage to address the new creative vision.

48.     Because Sycamore and Mr. Malick were developing this new creative approach

and VFX production plan, and consistent with both parties' understanding that the production

schedule would be delayed, SSPL did not make the full monthly installments in accordance with

the Payment Schedule set forth in Schedule 8 to the Agreement.

49.     Sycamore engaged in an ongoing and regular dialogue with Rosenfeld,

Sycamore's sole means of contact with Roald and SSPL, concerning VOT's new proposed

delivery date, as well as Sycamore's cash needs and visual effects status, so that SSPL would be fully informed about the redevelopment of VOT's creative and production plan. On a number of occasions, Rosenfeld told Mr. Malick and Sycamore that they could rely on an extended delivery schedule to accomplish SSPL's request for a new creative approach and VFX production plan.

50.     To that end, on July 16, 2012, Green spoke to Rosenfeld about installing a program on his computer so he could review of the VFX progress for VOT. This program was subsequently installed and Rosenfeld was invited to participate in numerous conference calls concerning these reviews.

51.     During this time, shooting for VOT nonetheless continued. Sycamore completed 10 days of shooting in Point Lobos and 10 days of shooting in New Mexico and Colorado.

**SSPL Delays Funding and Makes Additional Demands**
**of Sycamore and Mr. Malick That Are Directly Contrary to the Agreement**

52.     Beginning in October 2012, when additional funding from a corporate sponsor fell through, Sycamore began to notice a significant change in SSPL and Rosenfeld's attitude toward Sycamore, Mr. Malick and VOT. Rosenfeld in particular became antagonistic toward Sycamore and aligned himself with SSPL and Roald.

53.     On October 2, 2012, Sycamore's accountant sent a funding request to SSPL via Rosenfeld. SSPL, in violation of the Agreement, did not immediately fund this request.

54.     Rosenfeld instead told Sycamore that he wanted to bring a potential corporate sponsor, Cadillac, to Sycamore's editorial offices in Austin, Texas on October 14 and 15, 2012. Although VOT was fully funded, Rosenfeld stated that Cadillac was contemplating funding $5 million to VOT, some of which might be used to enhance production. Rosenfeld later informed Sycamore that Roald would also be attending the Cadillac meeting.

55.     In advance of the Cadillac meeting, Green sent a proposed itinerary to Rosenfeld, which he approved.

56.     During the Cadillac meetings on October 14 and 15, 2012, Sycamore screened a video regarding the proposed enhanced visual effects for VOT, and Mr. Malick made a 2-hour presentation describing VOT and showing edited footage to date.

57.     In addition, in response to Roald's April 2012 request that VOT be "more unique" and add enhanced visual effects, and in light of the parties' agreement that the delivery schedule for VOT would need to be extended to accommodate this request, Sycamore provided Roald with two proposed production schedules:  (1) continue to use licensed footage and stick to the delivery schedule set forth in the Agreement; or (2) create entirely new VFX and extend the delivery date seven months.

58.     After the formal presentations concluded, Roald, rather than just reiterating his April request that VOT be more "unique" and incorporate more sophisticated visual effects, demanded that Sycamore and Mr. Malick eliminate all licensed footage from VOT.  This was a substantial and material deviation from the prior production plan and budget which, for both financial and logistical reasons, contemplated the use of licensed third-party footage in VOT.

59.     Sycamore and Mr. Malick were extremely surprised by Roald's demand to eliminate this footage, given that Rosenfeld, Sycamore's sole means of contact with Roald and SSPL, was long aware of the plan to use certain licensed third-party footage in VOT.  In fact, when the Letter Agreement was being negotiated, Sycamore specifically told Rosenfeld to advise Roald that "the majority of the VFX" for VOT would be licensed.  This was largely due to the expense and rarity of this footage, which would be extremely difficult and expensive to reshoot.

60.     Sycamore explained to Roald that, if Sycamore were to acquiesce to Roald's demand and not use any licensed third-party footage, completion of VOT would cost significantly more time and money, and an extension of the delivery schedule would be necessary.

61.     On October 19, 2012, Rosenfeld wrote to Green regarding the two production schedules that Sycamore had offered Roald.  Rosenfeld stated, "He was offered two choices on paper Monday afternoon, but the choice of sticking to the agreed schedule was not a valid choice."

**Sycamore Fully Complies With An Audit Conducted By SSPL**

62.     After the Cadillac funding fell through, SSPL suddenly hired a U.K. auditor named Tony Miller and began demanding financial information from Sycamore, including all of VOT's accounting materials, an explanation of VOT's various bank accounts, complete check registers for VOT, and complete American Express bills and back-up for VOT's account. Sycamore provided all requested information (including all of Sycamore's original accounting records) to Miller and Rosenfeld in a timely fashion.

63.     During the audit, Miller merely raised minor questions to Sycamore, all of which Sycamore fully responded to.

64.     At the conclusion of SSPL's audit, Miller did not express any outstanding concerns to Sycamore.

**In Violation of the Agreement, SSPL Delays**
**Funding Sycamore's October 2012 Cash Request**

65.     However, Sycamore had still not received the funding it requested in October 2012 from SSPL.

66.     On November 9, 2012, Sycamore sent Rosenfeld an email regarding its unfunded October cash request, which stated, "We are just about out of cash as our October cash request was not funded."

67.     Having not received any response from Rosenfeld, Sycamore sent him a follow-up email on November 17, 2012, which stated, "If there is any question about ongoing funding, we will have to give notice right away to all paid staff and won't have anyone to respond to [Miller's] requests, nor to finish the VFX plan and budget....Please would you let us know when we may expect these funds?"  Green and Gonda also tried to contact Rosenfeld numerous times via phone, but was unable to reach him.

68.     Sycamore sent Rosenfeld yet another follow-up email on November 19, 2012, which stated:

> [P]lease will you let us know if this funding will be en route in the next day or so, or if we should start considering trying to negotiate furloughs or layoffs? As you know, we have tried repeatedly over the last week and a half to get on the phone with you in order to understand all the recent activity.  If there is concern about our integrity, I believe [SSPL's accountant] can speak to the fact that we have been completely transparent and there is nothing awry in our accounting and production....We can't be in a position where folks are working and we are unable to pay them....Terry returned to Austin on Thursday and was in the cutting room first thing Friday, all through the weekend and onward, working exclusively on VOT...we need to know that funding will continue uninterrupted.

69.     That same day, Sycamore informed Miller and Rosenfeld that VOT's cash balance was down to $13,000.

70.     On November 20, 2012, SSPL agreed to fund $54,970.40 to keep VOT afloat for four weeks.  On November 23, 2012, Rosenfeld sent Sycamore a check drawn from his company, High Line Pictures.

71.     As of December 12, 2012, SSPL had only funded $3,359,972 of the $6,673,506 it was obligated to fund by that date pursuant to the cash flow schedule set forth in the Agreement.

**Sycamore Responds to SSPL's Demands and Provides SSPL With Complete Transparency in Connection with the Production of VOT, While SSPL Refuses to Confirm the Previously Agreed-Upon Extended Production Schedule**

72.      On or about November 28, 2012, Roald sent Mr. Malick a letter stating that certain changes needed to be made in order for SSPL to continue satisfying its funding obligations. These "changes", however, were directly contrary to the understanding set forth in the Agreement. For example, Roald demanded that Mr. Malick "commit exclusively" to VOT, even though the Agreement provided that Mr. Malick's work on VOT was "non-exclusive." Agreement Schedule 9, ¶ 2(c). Roald stated that his attorney would send a proposed amendment to the Agreement reflecting his demands and incorporating the agreed-to extended schedule.

73.      On or about December 7, 2012, SSPL presented Sycamore with a proposed amendment to the Agreement. In connection with its consideration of the proposed Amended Financing Agreement, SSPL made several demands on Sycamore. Sycamore did its best to respond to those demands.

74.      Thus, by email dated December 13, 2012, responding to SSPL's purported concerns about the progress of production of VOT and financial reporting in connection with VOT, Sycamore sent counsel for SSPL a "line calendar" showing all shoots for VOT dating from the execution of the Agreement and confirmed that Sycamore had sent both a hard drive containing, and **a complete set of the original accounting documents for VOT since 2008**, as well as schedules and production reports for each shoot since VOT's inception.

75.      In addition, in connection with the new production plan demanded by SSPL, Sycamore sent SSPL a new production budget and schedule, as well as evidence of the new creative plan, including a description of "skunkworks" shoots (first stage VFX), the 3300 minutes of unique footage produced to date, and a description of editing work.

76.     In another email dated December 14, 2012, counsel for Sycamore conveyed Mr. Malick's willingness "to present, in person, his [new] design for the flow and cut of the film and his plan for the creative direction of VOT in light of SSPL's recent requests. For reasons of efficiency and effectiveness, this would be best achieved if [SSPL] was able to be in Austin before or directly after Christmas. If that is not at all possible, in the interest of creative cooperation, Terry is prepared to travel to London to make this presentation. Terry feels so committed to this project and relationship that not to allow for this presentation to occur in the right setting and context would be extremely unfortunate."

77.     On December 15, 2012, Sycamore, through its counsel, provided its comments to the proposed amendment to the Agreement. In that context, Sycamore pointed out to SSPL why its demand that the amendment provide that, going forward, Mr. Malick would be exclusive to VOT was entirely unreasonable. As Rosenfeld and SSPL knew, it was impossible for Sycamore to supply Mr. Malick's directing services on an exclusive basis because Mr. Malick had other contractual directing commitments. That is precisely why the Agreement did not require, and the inducement letter signed by Mr. Malick was not, an exclusive services agreement for VOT; indeed, non-exclusivity was a fundamental condition for Mr. Malick's participation in the project. Agreement, Schedule 9, ¶ 2(c).

78.     In an email dated December 17, 2012, counsel for SSPL stated that Sycamore's comments to the proposed amendment were "not acceptable to [his] client" and turned down Mr. Malick's invitation to screen edited VOT footage and to present his revised plan for VOT to Roald.

79.     At the same time, Sycamore, in response to SSPL's demand, delivered to SSPL's counsel two hard drives containing all of the approximately 55 hours of original footage

produced for VOT. The footage was delivered to SSPL on December 24, 2012. Sycamore was not obligated to provide such footage to SSPL pursuant to the terms of the Agreement, but did so in an effort to provide full transparency concerning the nature and extent of the filming and other creative efforts that had, so far, gone into the production of VOT, including 3300 minutes of raw footage, the product of over 15 shoots (175 shooting days) since 2008 conducted around the world, and several hundred pre-vis visual effects shots.

80.    SSPL, however, withdrew its proposal to amend the Agreement on December 28, 2012.

## SSPL Fails to Meet its Funding Obligations and Wrongfully Terminates the Agreement

81.    By email dated December 28, 2012, SSPL's counsel informed Sycamore that SSPL did not have an obligation to continue funding the production of VOT and refused to fund Sycamore's January 2013 cash request. SSPL attempted to justify the suspension of the funding based on a typographical error in the Agreement and an objectively unreasonable position that the *January* payment was triggered by completion of "Picture Lock," a Production Milestone that the Agreement provided would occur in *February*. Agreement, Schedule 6. SSPL's position, on its face, was unreasonable, as it would require Sycamore, without ongoing funding, effectively to complete or to "lock" VOT prior to the date that the Agreement scheduled confirmation of "Picture Assembly" (a rough draft of a documentary film).

82.    In an email dated January 7, 2013 to SSPL's counsel and a letter of the same date to Roald, Sycamore rejected SSPL's demonstrably bad-faith position that it had no obligation to continue funding until Picture Lock was achieved and demanded that SSPL meet its continuing obligation to fund VOT.

83.     Sycamore nonetheless continued to move forward with the production of VOT. On or about January 7, 2012, Sycamore confirmed to SSPL that it had completed Picture Assembly for VOT, provided SSPL with detailed documentation of the Picture Assembly and offered to make Mr. Malick available to SSPL to present portions of the Picture Assembly. This proposed presentation of the Picture Assembly was not required by the Agreement; however, Sycamore and Mr. Malick offered to do the presentation in an effort, once again, to provide SSPL with full transparency concerning the production of VOT.

84.     By letter dated January 11, 3013, SSPL purported to "serve formal notice" that Sycamore was in material breach of the Agreement (the "SSPL Notice Letter"). The SSPL Notice Letter asserted that Sycamore had breached the Agreement by, among many other things, failing "to use best efforts to complete [VOT] in accordance with [the production and post production schedule] set forth in the FFPA" as evidenced by the non-occurrence of "Picture Lock" by January 4, 2013 and "Picture Assembly" by January 7, 2013. In addition, SSPL asserted that it "reasonably" believed that Sycamore would not be able to meet future "Production Milestones" in February and March of 2013.

85.     The SSPL Notice Letter indicated that, in the event Sycamore failed to cure all of the breaches set forth in the Notice Letter, SSPL would exercise its termination rights under the Agreement. At the same time, the Notice Letter reiterated SSPL's position that during this purported "cure" period, SSPL was suspending its payment obligations under the Agreement.

86.     In addition, SSPL made sure that Sycamore would not have access to the original footage for VOT during the "cure" period. By letter dated January 11, 2013, counsel for SSPL placed Foto Kem Labs (which was in possession of the high resolution VOT negatives for VOT ) on formal notice that SSPL was the holder of the copyright in such footage and that Foto Kem

37

should "not release the Voyage of Time footage or any footage related thereto … to any party (including Sycamore) without providing prior notice to, and obtaining consent from, SSPL."

87.    By letter dated January 17, 2013, counsel for Sycamore responded to the SSPL Notice Letter, denying that Sycamore was in breach of the Agreement and asserting that Sycamore was in full compliance with its obligations to produce VOT in accordance with the Production and Post Production Schedule in the Agreement and to use its best endeavors to complete VOT in accordance with the Picture Budget ("Sycamore's Notice Letter").

88.    In Sycamore's Notice Letter, Sycamore put SSPL on notice of SSPL's material breaches of the Agreement by reason of its (1) failure to comply with its payment obligations; (2) other actions taken by SSPL, which made it substantially more difficult for Sycamore to perform its obligations under the Agreement, including SSPL's direction to Foto Kem limiting Sycamore's access to the footage for VOT; and (3) SSPL's wrongful termination of the Agreement.

89.    In addition, Sycamore's Notice Letter put SSPL on notice that, while SSPL's Notice Letter purported to trigger a 30-day cure period, SSPL's suspension of funding and instruction to FotoKem not to release any of the VOT footage to Sycamore rendered Sycamore's right to cure meaningless.

90.    Sycamore has no adequate remedy of law for SSPL's breaches.  Sycamore is ready, willing and able to perform the Agreement and has fulfilled all of its contractual obligations to date.  SSPL's material and willful breaches and wrongful termination of the Agreement, however, defeat the essence of the parties' Agreement.  Moreover, SSPL is purporting hold VOT hostage by claiming ownership of VOT's copyright, production materials and footage, which are unique and based upon Mr. Malick's creative vision.  Monetary damages

would not adequately compensate Sycamore for this loss.  Unless these are returned to Sycamore, it and Mr. Malick will be unable to complete VOT.  Equity thus demands that Sycamore own the copyright and all VOT production materials and footage, so that Sycamore and Mr. Malick can complete VOT, or, if rescission or restitution not be granted, that SSPL be ordered to specifically perform each and every one of its obligations under the Agreement.

## CAUSE OF ACTION
### Breach of Contract

91.     Sycamore realleges and incorporates by reference paragraphs 1-92 as if fully set forth herein.

92.     The Agreement is a valid and enforceable contract governed by New York law.

93.     Sycamore is in compliance with its obligations under the Agreement.

94.     SSPL has failed to comply with its obligations under, and materially breached, the Agreement by:

- failing to comply with its payment obligations;

- not having the financial ability to fully perform its funding obligation;

- failing to give Sycamore proper notice of breach and an opportunity to cure pursuant to the terms of the Agreement;

- wrongfully exercising its purported termination rights under the Agreement; and

- interfering with Mr. Malick's right to control the creative content of VOT; and

- acting in a manner that made it substantially more difficult for Sycamore to perform its obligations under the Agreement, including by demanding that Sycamore eliminate nearly all licensed footage from VOT, by

39

suspending funding for VOT and by directing Foto Kem to limit

Sycamore's access to the footage for VOT.

95.    None of the foregoing breaches have been cured by SSPL.

96.    As a result of SSPL's breach of the Agreement, Sycamore has been damaged in

an amount for which there is no remedy at law.

WHEREFORE, Defendant/Counterclaim-Plaintiff Sycamore respectfully requests on its

counterclaim the following:

(a)    Dismissal of SSPL's Complaint in its entirety, with prejudice;

(b)    An order directing SSPL to perform fully its obligations under the

Agreement; or in the alternative;

(c)    Restitution or return, in equity, of the copyright in VOT, as well as all

VOT production materials and footage, to Sycamore; or in the alternative;

(d)    Rescission of the Agreement thereby returning the copyright in VOT, as

well as all VOT production materials and footage, to Sycamore; or in the

alternative;

(e)    Monetary damages in an amount to be determined at trial; and

     (f)     Reasonable attorneys' fees and costs pursuant to applicable statute or law,

and all such other and further relief as the Court deems just.

Dated: New York, New York
       September 23, 2013

FRANKFURT KURNIT KLEIN & SELZ,
P.C.

By:_____

     Maura J. Wogan
     Caren E. Lerner

488 Madison Avenue
New York, New York  10022
Phone:  (212) 980-0120
Fax:     (212) 593-9175
mwogan@fkks.com
clerner@fkks.com

*Attorneys for Defendant Sycamore Pictures,*
*LLC*